# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs August 9, 2016

## STATE OF TENNESSEE v. THOMAS H. BULLINGTON

**Appeal from the Circuit Court for Lincoln County**
**No. 15-CR-89    Forest A. Durard, Jr., Judge**

_____

**No. M2016-00215-CCA-R3-CD – Filed September 1, 2016**

_____

The Defendant, Thomas H. Bullington, was convicted by a Lincoln County Circuit Court jury of violation of an order of protection, a Class A misdemeanor. *See* T.C.A. § 39-13-113(a)(1) (2014). The Defendant received a sentence of eleven months, twenty-nine days. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred by ordering the maximum sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J. joined.

Robert T. Carter, Tullahoma, Tennessee, for the appellant, Thomas H. Bullington.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Robert J. Carter, District Attorney General; and William Bottoms, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from a family dispute between the victim and the Defendant, who is the victim's uncle. At the trial, the victim testified that he was an attorney and that the Defendant had "continually" made threats against him and his family. The victim said that he obtained an order of protection against the Defendant around August 2012, when the Defendant threatened him, the victim's grandmother, and the victim's children. The victim stated that the threats were a repeated pattern, which placed him in fear of harm for himself, his grandmother, his wife, and his children. The victim said that the Defendant called the victim's mother, who was not included in the order of protection,

and wrote her letters in which he threatened the victim. The victim stated that he "just wanted to be left alone."

The victim identified an August 30, 2013 order of protection and an August 15, 2014 extension of the order, which was valid until September 11, 2015.[1] The order of protection included a provision which stated, "You . . . must not contact [the victim] . . . either directly or indirectly[.]" The order also included a provision that the Defendant "Not abuse or threaten to abuse [the victim] or [the victim's] minor children." The victim said that the order of protection included the victim, the victim's stepson, the victim's son, and the victim's daughter. The victim stated that the 2014 extension added his grandmother. The victim testified that the Defendant violated the order of protection in May 2015.

The victim testified that he had advised clients on orders of protection "quite often." He said that obtaining an order of protection was a serious matter and that he wanted the Defendant not to contact him or his family. The victim said that the Defendant threatened the victim's life and used the victim's mother to antagonize the victim, including writing her "disturbing" letters. The victim said that the Defendant drove a dark green Dodge Durango and that the victim worried about what "he could do with that, if [the victim's children were] outside in the yard playing."

The victim testified that for years, he asked the Defendant to leave him and his family alone, that the Defendant had left town previously, that the Defendant returned, and that the threats resumed. The victim said that if he had not felt his family was threatened or if he had not had "a level of fear and concern," he would not have obtained an order of protection.

The victim testified that on May 13, 2015, the victim appeared in court and that several attorneys and a full gallery were inside the courtroom. The victim said he saw the Defendant sitting in the front row of the gallery, that the Defendant and the victim did not speak, and that the victim was concerned. The victim stated that court personnel advised the judge of the situation, that the judge called the Defendant to the bench and spoke to him, that the victim did not hear the conversation, and that the Defendant left. The victim said that the Defendant did not have business in court that day. The victim stated that although the incident made him uneasy, he did not intend to report the Defendant for violating the order of protection.

The victim testified that he decided to obtain charges against the Defendant due to a telephone call the Defendant made the following day to the victim's mother. The

---

[1] The victim also said that on September 10, 2015, he filed for a ten-year extension of the order of protection due to the Defendant's repeatedly violating the order and that a hearing was set for two weeks after the trial.

victim said that the Defendant threatened the victim's children and that the Defendant said the victim "was digging [his] hole even deeper." The victim noted that an order of protection was "just a piece of paper" and that the victim felt safer with the Defendant in jail.

On cross-examination, the victim testified that he was age forty-four and in good physical health, that the Defendant was in his sixties, and that the Defendant was paralyzed on his left side and walked with a limp due to a stroke. The victim said that the Defendant had abused drugs and alcohol "for some time." The victim did not know whether the Defendant was homeless. The victim said that the Defendant had threatened him for four or five years. The victim stated that he probated the Defendant's father's will and that the Defendant did not threaten to sue the victim regarding the will or any other matter. The victim did not remember whether the Defendant's threats started when the will was probated. The victim said that the Defendant had written letters to the victim's mother in which the Defendant threatened to file a complaint with the Tennessee Board of Professional Responsibility about the victim. The victim stated that although he did not appreciate the threat because he had done nothing wrong, he was not angry.

The victim testified that on May 13, 2015, the Defendant sat in the courtroom gallery, that the Defendant stared at him, and that the victim looked at the Defendant once and did not look at him again. The victim agreed that the courtroom was crowded. The victim said that he would not have been surprised if the victim's name were not on the civil docket for that day and that the victim sometimes went to court in order to have the judge sign agreed orders.

The victim testified that he heard the judge ask the Defendant whether he was aware an order of protection was in effect. The victim said that the judge told the Defendant, "You knew there was an order of protection in place. You know that he works up here every day," and it would be wise if the Defendant left. The victim stated that the Defendant left without hesitation or argument.

The victim testified that he did not include in the warrant for the Defendant's arrest that the Defendant left the courtroom. The victim said that other than a court proceeding on May 20, he had not seen or spoken to the Defendant since May 13. The victim acknowledged that the Defendant had not been in a position to carry out threats since May 20, and that at the court proceeding, the victim was the only witness to testify about the May 13 incident.

Dinah Richardson, the victim's mother, testified that the Defendant was her brother and that the Defendant called her on May 14, 2015. She said that the Defendant was very upset and angry at the victim because the Defendant had been asked to leave a courtroom and that the Defendant blamed the victim, although the victim was "not aware of it." Ms. Richardson stated that the Defendant instructed her "to tell [the victim] that

[the Defendant] was going to get him and really get him [t]his time . . . even if he had to get him through his children." Ms. Richardson said that although the connection was poor for a portion of the call, the Defendant mentioned the victim's " -on and -aughter," which she knew referred to the victim's son and daughter, and the Defendant said it would hurt the victim more if something happened to his children. Ms. Richardson stated that the Defendant asked her to persuade the victim's grandmother to lend him some money.

Ms. Richardson testified that since the May 14 telephone call, she had received several "nasty" and threatening letters from the Defendant. Ms. Richardson said that her name was not included in the order of protection.

On cross-examination, Ms. Richardson testified that the Defendant had "vented" to her and had been upset for a long time, that he had made threats previously, and that he had threatened to have the victim disbarred. Ms. Richardson said the Defendant told her that he was in contact with "Pablo Esteban," a Colombian drug lord who had been dead for twenty-two years, that Mr. Esteban's attorney was going to help disbar the victim, and that the Defendant was working with another attorney to disbar the victim.

Ms. Richardson testified that on May 14, the Defendant called her twice. Ms. Richardson stated that the Defendant told her the victim was "digging his hole deeper." Ms. Richardson acknowledged that the Defendant could have referred to his threats to have the victim disbarred, although Ms. Richardson noted that the Defendant had threatened previously to hire a "hit man." Ms. Richardson denied the Defendant had ever told her that he was going to tell the victim's children about the family dispute when they were older.

Ms. Richardson testified that on May 14 or 15, she called the victim to tell him about the Defendant's telephone call. Ms. Richardson acknowledged that the arrest warrant affidavit did not reflect that the Defendant told Ms. Richardson to convey his threat to the victim. She said, though, that she had been upset and that the Defendant told her to tell the victim. Ms. Richardson said that the situation was difficult for her because it involved two people she loved.

On redirect examination, Ms. Richardson read from the arrest warrant affidavit, which stated that the Defendant told her to tell the victim about the threats. Ms. Richardson said that the Defendant had previously threatened to harm the victim. She stated that the Defendant told her during the second telephone call that he wanted her to understand what he meant in the first call and that he was not backing down.

On recross-examination, Ms. Richardson acknowledged that the affidavit did not mention the second telephone call. Ms. Richardson said that she felt sorry for the Defendant because he had many problems and that when he called, she tried to answer.

Lincoln County Sheriff's Deputy Tull Malone testified that that he had known the victim's family for a long time and that he was aware of family problems between the victim and the Defendant. Deputy Malone said that he received a telephone call at the police station in May 2015, in which an unidentified man asked whether an arrest warrant had been issued for the Defendant. Deputy Malone stated he checked the system and responded affirmatively. Deputy Malone said that before ending the call, the caller told him, "I guess I can get to John through his kids," and that the caller said he would turn himself in to the police. Deputy Malone did not know whether the caller was the Defendant. Deputy Malone said that the Defendant later turned himself in to the police.

The Defendant testified that he was paralyzed on his left side and walked with a limp as a result of a stroke and subsequent fall in a rehabilitation hospital. He did not think his mind had been affected by the stroke. The Defendant stated that he thought the victim had gone into "a mental institution and had my dad change his will." The Defendant said that he had threatened to report the victim to the Tennessee Bar Association (TBA) but denied that he made any other threats.

The Defendant testified that on May 13, 2015, he had an appointment at a bank to open an account, that the bank was not yet open, and that he decided to sit at the courthouse and observe. He said that he arrived in the courtroom before the majority of people and that the judge called his name and spoke to him about having met the Defendant's father. The Defendant said that the judge asked him whether he knew the victim had an order of protection against him, that the judge told him the victim was in the courtroom, and that the Defendant had not seen the victim. The Defendant said that he told the judge he would leave and that he retrieved his hat and left. The Defendant said that he told the judge he had no court business and that he was only there to "kill time."

The Defendant testified that he had not seen the victim for a long time before May 13 and that he never wanted to see the victim again. The Defendant said that he did not have a home in Lincoln County and that he could have gone to a restaurant but chose to go to court instead.

The Defendant testified that he was worried about the courtroom incident and that, as a result, he called Ms. Richardson and told her what happened. He said that he asked whether she thought he was in trouble, that Ms. Richardson did not know, that Ms. Richardson asked him why he went to court and told him he should have known the victim would be there, and that the Defendant told her the victim could have been in any number of counties. The Defendant denied threatening the victim or the victim's children. The Defendant acknowledged saying he "was going to try to get to John through his children" but said he meant he was going to tell the children when they were adults about the victim's having the Defendant arrested and jailed. He said, though, that he did not think he explained the statement to Ms. Richardson. The Defendant denied

telling Ms. Richardson to convey anything to the victim but said that "anything I tell her, she's going to tell everybody else in town." The Defendant stated that the only threat he made was to contact the TBA and that he wrote a letter to the TBA.

The Defendant testified that the following day, he called the jail and asked whether a warrant had been issued for his arrest. He said that he identified himself to the deputy, that the deputy told him there was a warrant for his arrest, that he knew Deputy Malone very well, but that he did not recognize Deputy Malone's voice on the telephone. The Defendant denied making any threats during the call.

The Defendant testified that it was possible he had threatened the victim previously but that he was unsure. The Defendant agreed that "bad blood" existed between him and the victim because the victim changed the Defendant's father's will when the Defendant's father was mentally incompetent. The Defendant said that after he spoke to the deputy at the jail, he turned himself in to the police. The Defendant said that a woman at the jail told him he was being arrested for going to court as a spectator and that the victim had signed the warrant. The Defendant stated that he was arrested and had been in jail for 120 days for "sitting in court[.]"

On cross-examination, the Defendant testified that his and the victim's disagreement began about five years before the trial. The Defendant said that in May 2015, he knew that the victim had obtained an order of protection against him and that he was not supposed to have any contact with the victim, the victim's children, or the victim's grandmother. The Defendant denied physically threatening the victim's children. The Defendant acknowledged that he "can't stand" the victim and that the victim made him angry, although he said that he did not hate the victim. The Defendant acknowledged knowing Ms. Richardson would tell the victim about the telephone call. He acknowledged writing a letter in which he referred to the victim's stepson and stated that he would visit the victim in 2016 unless the victim was "scared and renew[ed] the order of protection again." The Defendant said that he was going to communicate the situation to the victim's children through the victim's stepson.

The State elected the May 14 telephone call to the victim's mother as the specific incident to be proven. Upon this evidence, the Defendant was convicted of violating an order of protection. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction because the Defendant did not contact the subject of the order of protection and did not make a specific threat of violence. The State responds that the evidence is sufficient.

-6-

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-13-113(a)(1) states that it is an offense "to knowingly violate" an order of protection. In order to constitute a violation of Code section 39-13-113:

(1) The person must have received notice of the request for an order of protection or restraining order;

(2) The person must have had an opportunity to appear and be heard in connection with the order of protection or restraining order; and

(3) The court made specific findings of fact in the order of protection or restraining order that the person committed domestic abuse[.]

*Id.* § 39-13-113(f)(1)-(3) (2014). Domestic abuse is defined, in relevant part, as abuse committed against an adult or minor related to the person by blood or marriage. *See id.* § 36-3-601(4),(5)(D), (E) (2014). Abuse is defined, in relevant part, as "placing an adult or minor in fear of physical harm[.]" *Id.* § 36-3-601(1).

In the light most favorable to the State, the record reflects that on May 14, 2015, an order of protection was in effect against the Defendant. The order included the victim, the victim's children, and the victim's grandmother as persons the Defendant was prohibited from contacting. The amended order of protection referred to a court hearing on the matter, in which the Defendant had an opportunity to appear and be heard. The order of protection stated under "findings of abuse" that the Defendant abused or threatened to abuse the victim. On May 14, the Defendant called Ms. Richardson and asked her to tell the victim that he "was digging his hole deeper" and that the Defendant was "going to get him and really get him [t]his time . . . even if he had to get him

-7-

through his children." The Defendant told Ms. Richardson to ask the victim's grandmother, who was also the Defendant's mother, for money. The Defendant stated that he knew about the order of protection and that it named both the victim and the victim's grandmother.

The Defendant's argument that the order of protection should not have included indirect communication with the victim is without merit and disregards the plain language of the order. The order of protection states next to a marked checkbox, "You . . . must not contact Petitioner . . . either directly or indirectly[.]" A ban on indirect communication was intended by the issuing court, and the record reflects that the Defendant violated it.

Relative to the Defendant's contention that his threat was not reasonably construed as one of physical harm, the jury by its verdict discredited the Defendant's testimony that the threat only referred to legal action or eventually speaking to the victim's children after the expiration of the order. The statements that the Defendant was "going to get him and really get him [t]his time . . . even if he had to get him through his children" and that it would hurt the victim more if something happened to his children could reasonably be interpreted by a rational jury as a threat of physical harm against the victim or his children. The evidence is sufficient to support the Defendant's conviction, and the Defendant is not entitled to relief on this basis.

## II

### Sentencing

The Defendant contends that the trial court erred by ordering the maximum sentence, arguing that the sentence was not supported by the evidence. He requests a reduced sentence of ten days. The State responds that the trial court did not err in sentencing the Defendant. We agree with the State.

At the sentencing hearing, the trial court noted that it considered the factors required in felony sentencing as "guiding principles." The court found that the Defendant had been convicted of three previous violations of the victim's order of protection and that the Defendant had not been successful on probation. The State's pretrial motions reflect that the Defendant had a sixteen-year-old driving under the influence conviction, which the trial court did not consider in sentencing, and a 2012 "joyriding" conviction, for which the Defendant was placed on probation. On May 21, 2013, the Defendant's probation was revoked because he had been convicted of violating the order of protection.

The trial court found based upon the Defendant's criminal history, the appropriate sentence length was eleven months, twenty-nine days. Relative to the manner of service,

the court considered whether alternatives to confinement had been successfully applied to the Defendant, whether probation would depreciate the seriousness of the offense, whether there were threats of bodily injury, and whether incarceration would deter others from similar behavior. The court stated that it gave particular weight to whether the Defendant had successfully completed probation in the past. The court found that although the Defendant had successfully completed probation in connection with his DUI conviction, the Defendant's probation for the joyriding conviction had been revoked as a result of his multiple convictions for violating the present order of protection. The court found that alternatives to confinement had been recently and unsuccessfully applied to the Defendant.

Relative to the order of protection, the trial court found that the order showed the Defendant was to have no direct or indirect contact with the victim, that the contact for which the Defendant was convicted related to the victim, and that the behavior was "a way to circumvent the order or the spirit and the intent of the order." The court found that the Defendant was not a good candidate for alternative sentencing and that the Defendant had demonstrated he would not follow the court's instructions. The court sentenced the Defendant to eleven months, twenty-nine days at seventy-five percent service.

Tennessee Code Annotated 40-35-302(b) (2014) governs misdemeanor sentencing, which requires a trial court to impose a specific sentence consistent with the purposes and principles of the Sentencing Act. Likewise, if a trial court orders a defendant to serve a sentence in confinement, the court must fix a percentage of the sentence a defendant is required to serve. *Id.* § 40-35-302(d). Although a trial court is not required to hold a sentencing hearing, the court must permit the parties to address "the length of any sentence and the manner in which the sentence is to be served." *Id.* § 40-35-302(a). Trial courts are granted considerable discretion and flexibility in misdemeanor sentencing determinations, and defendants convicted of misdemeanors are not presumed eligible for alternative sentencing. *State v. Troutman*, 979 S.W.2d 271, 273 (Tenn. 1998); *see State v. Combs*, 945 S.W.2d 770, 773-74 (Tenn. Crim. App. 1996); *see also State v. Williams*, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995). Likewise, defendants convicted of misdemeanors are not "entitled to the presumption of a minimum sentence." *State v. Creasy*, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). In determining the percentage of service for misdemeanors, a trial court must consider the purposes and principles of sentencing and the enhancement and mitigating factors and must not impose arbitrary incarceration. T.C.A. § 40-35-302(d); *see Troutman*, 979 S.W.2d at 274 (stating that "while the better practice is to make findings on the record when fixing a percentage of a . . . sentence to be served in incarceration, a . . . court need only consider the principles of sentencing and enhancement and mitigating factors . . . to comply with the legislative mandates of the misdemeanor sentencing statute").

This court reviews challenges to sentences imposed for felony offenses relative to the manner of service within an appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The same standard of review applies to questions related to probation or any other alternative sentence. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Although our supreme court has not considered whether the abuse of discretion with a presumption of reasonableness standard applies to misdemeanor sentencing determinations, it has stated that the standard "applies to all sentencing decisions," and this court has previously applied the standard to misdemeanor sentencing. *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014); *see State v. Sue Ann Christopher*, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *6-8 (Tenn. Crim. App. Mar. 14, 2013), *perm. app. denied* (Tenn. June 18, 2013); *State v. Christopher Dewayne Henson*, No. M2013-01285-CCA-R3-CD, 2015 WL 3473468, at *5-6 (Tenn. Crim. App. June 2, 2015) *perm. app. denied* (Tenn. Sept. 17, 2015); *see also* T.C.A. § 40-35-401(d) (2014) (stating that all sentencing issues raised pursuant to Code section 40-35-401(a) are subject to the same standard of review).

Generally, compliance with the purposes and principles of sentencing requires a trial court to consider any evidence received at the trial and sentencing hearing, the presentence report, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see* T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see also* T.C.A. § 40-35-102 (2014).

The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

The record reflects that the trial court considered the appropriate purposes and principles of sentencing in imposing a sentence of eleven months, twenty-nine days at 75% service. The Defendant had previously violated the victim's order of protection three times. Alternative sentencing, such as the Defendant's probation related to the joyriding conviction, did not deter the Defendant from disregarding the court's instructions, and his probation was revoked as a result of the second violation of the order. The trial court did not abuse its discretion in imposing the maximum sentence and denying probation or an alternative sentence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE